Isenhour *v.* State.

---

### Isenhour *v.* The State.

[No. 19,501.   Filed December 11, 1901.]

CRIMINAL LAW.—*Conviction for Violation of Penal Statute.—Appeal.* —One convicted for having violated a penal statute can have no questions under the statute reviewed on appeal which were not raised in his particular case.  *p. 520.*

FOOD.—*Adulteration.—Prosecution Under Act of 1899.*—An affidavit charging one with having for sale adulterated milk, in violation of §2 of the act of February 28, 1899 (Acts 1899, p. 189), need not disclose whether any property was taken from defendant, or how the evidence against him was procured, and it is therefore immaterial whether or not the act provides for the taking of property without just compensation.  *pp. 519-521.*

CONSTITUTIONAL LAW.—*Delegation of Legislative Authority.*—The provision of the pure food law of 1899 (Acts 1899, p. 189), that within ninety days after the passage of the act the board of health shall adopt measures necessary to facilitate the law's enforcement, and prepare rules regulating minimum standards of foods, defining

| | |
|---|---|
| 157 | 517 |
| 160 | 883 |
| 157 | 517 |
| 168 | 66 |
| 168 | 185 |
| 168 | 508 |
| 157 | 517 |
| f171 | 58 |

Isenhour v. State.

specific adulterations, etc., does not render the law violative of §25, article 1, of the Constitution, which provides that "no law shall be passed, the taking effect of which shall be made to depend upon any authority except as provided in the Constitution." *pp. 521-523.*

CONSTITUTIONAL LAW.—*Delegation of Legislative Authority.*—The provision of the pure food law of 1899, that the State Board of Health shall adopt such measures as may be necessary to facilitate the enforcement of the law is not a delegation of legislative authority. *pp. 521-523.*

STATUTES.—*Title of Act.*—It is not essential to a good title that the subject of the act shall be expressed in exact terms. It is sufficient if the subject is fairly deducible from the language employed. *p. 524.*

FOOD.— *Constitutionality of Pure Food Law of 1899.— Title of Act.*— The following title of the pure food act of 1899 : "An act forbidding the manufacture and sale, or offer for sale, any adulterated foods or drugs, defining foods and drugs, stating wherein the adulterations of foods and drugs consist, and defining the duties of the State Board of Health," etc., is not in violation of the constitutional requirement that "every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title." *pp. 523-525.*

CRIMINAL LAW.—*Penal Statute.*—*Prohibitory Section.*—The fact that the prohibitory section of a penal statute does not include an act for which a penalty is imposed in a later section, does not render such later section invalid. *p. 525.*

FOOD.—*Violation of Pure Food Law.—Affidavit.*—An affidavit charging defendant with violating the pure food law of 1899 (Acts 1899, p. 189), and reciting that he "had in his possession, with intent to sell, one pint of milk, adulterated with a certain substance injurious to health, to wit, formaldehyde," is not bad for want of an allegation that formaldehyde is either poisonous or injurious to health. *p. 526.*

SAME.—*Violation of Pure Food Law.—Affidavit.*—An affidavit charging defendant with having in his possession adulterated food, need not allege that the food was adulterated by defendant. *p. 526.*

SAME.—*Enforcement of Pure Food Law by Others Than Board of Health.*—The provision of §2 of the pure food law of 1899, that it shall be the duty of the State Board of Health to enforce the provisions of such law, does not exclude individuals from making complaint against one for violation of the statute. *p. 526.*

SAME.—*Adulterated Milk.—Affidavit.*—Where one is charged with having in his possession, with intent to sell, milk adulterated with a substance injurious to health, it is not necessary that the affidavit charging the offense should allege that the milk in defendant's possession violated a certain standard fixed by the State Board of Health. *p. 527.*

Isenhour v. State.

Food.—*Adulterated Milk.* — *Affidavit.*— An affidavit charging one with having for sale adulterated milk, need not set out the proviso of §1 of the pure food law, that the law shall not apply to mixtures or compounds recognized as articles of food, and not injurious to health.  *p. 527.*

Opinion Evidence.— *Physician as an Expert Witness.*— Where a physician exhibits such a degree of knowledge as to make it appear that his opinion is of some value, he is entitled to testify, though his knowledge is gained from reading, study and conversations with other physicians, and not from his own experiments.  *pp. 527, 528.*

Food.— *Adulteration of Milk.*— *Evidence.*— *Directing Verdict.* — Where, in a prosecution of one charged with "knowingly" having adulterated milk in his possession, with intent to sell the same, the evidence showed that in the middle of the forenoon in the hot season of the year, defendant had the adulterated milk in his exclusive possession, with intent to sell and deliver it to a customer, it was proper to refuse to instruct the jury to return a verdict for defendant on the ground that it had not been proved that defendant had knowledge of the adulteration.  *pp. 528, 529.*

Same.—*Adulteration of Milk.*—*Evidence.*—Defendant was charged with having in his possession, with intent to sell, milk adulterated with formaldehyde. He testified that he had used no formaldehyde, and that the milk contained none, to his knowledge, but that at the time in question he had put into the milk a substance known as "Palmer's Preserver," and that the maker of the substance had told him that it contained no formaldehyde. Defendant was then asked what representations had been made to him as to the substance used, but was not permitted to answer, and a circular was offered in evidence and excluded, which accompanied the preservative and which stated that it was harmless and guaranteed to contain no acid or injurious ingredient. *Held,* that the exclusion of the evidence was reversible error.  *pp. 530, 531.*

From Marion Criminal Court; *Fremont Alford,* Judge.

Luther J. Isenhour was convicted of violating the pure food law of 1899, and appeals. *Reversed.*

*R. O. Hawkins* and *H. E. Smith,* for appellant.

*W. L. Taylor,* Attorney-General, *Merrill Moores* and *C. C. Hadley,* for State,

Hadley, J.—Appellant was convicted on an affidavit charging him with "unlawfully and knowingly having in his possession, with intent to sell the same, a certain substance

intended for food, to wit, one pint of milk then and there adulterated with a certain substance injurious to health, to wit, formaldehyde". Appellant's motions to quash the affidavit, and for a new trial, were overruled. Section 2 of the act of 1899, commonly known as the pure food law (Acts 1899, p. 189) in part provides: "Whoever fraudulently adulterates, for the purpose of sale, bread or any other substance intended for food with any substance injurious to health, or knowingly barters, gives away, sells or has in his possession with intent to sell, any substance injurious to health, shall be fined in any sum not exceeding $100."

I.   It is insisted that this act violates the following provisions of the State Constitution: (1) Section 21, article 1, which provides that "no man's property shall be taken by law without just compensation." (2) Section 25, article 1, which provides that "no law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution." (3) Section 19, article 4, which provides that "Every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title."

1.   From the beginning it should be borne in mind that appellant is charged with having in his possession adulterated milk with intent to sell the same, in violation of law. This and nothing more. He has the right therefore to call upon this court to review his conviction upon this particular charge, but he has no right to ask us to decide questions under the pure food law that do not arise in his case, and in which he has no special interest. *Henderson* v. *State,* 137 Ind. 552, 564, 24 L. R. A. 469; *Fessler* v. *Brayton,* 145 Ind. 71, 84, 32 L. R. A. 578; *Pittsburgh etc. R. Co.* v. *Montgomery,* 152 Ind. 1, 13, 71 Am. St. 301.

It is not disclosed by the affidavit that appellant had any property taken at all, or how the evidence against him was procured, nor is it necessary to the validity of the affidavit that it should be so disclosed; neither

can it be assumed that it was procured by a sample of the milk obtained in the way pointed out by the statute, as that method does not exclude competent evidence from any other proper source. Appellant is not being tried for resisting a seizure of his property, and it is therefore immaterial in this case whether the act of 1899 provides for the taking of property without just compensation. The only constitutional question that concerns the appellant is whether the penal provision of the act of 1899 under which he has been convicted has been enacted in the observance of constitutional requirements.

2. Does the act violate §25, article 1, providing that "no law shall be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution?" The pure food law provides that "within ninety days after the passage of this act the board of health shall adopt such measures as may be necessary to facilitate the enforcement thereof, and shall prepare rules and ordinances where and when necessary regulating minimum standards of foods and drugs, defining specific adulterations, and declaring the proper methods of collecting and examining drugs and articles of food." From this provision it is argued that the law could not become effective and "could not be violated until the state board met, within ninety days, prepared its rules, and passed its ordinances, regulating minimum standards, defining adulterations, and declaring the methods of collecting and examining foods" and is, in substance, an attempted delegation of legislative power to the State Board of Health. The obvious purpose of the provision last quoted was to commit to a body of learned and scientific experts the duty of preparing such rules, and prescribing such tests as may from time to time, in the enforcement of the law, be found necessary in determining what combination of substances are injurious to health, and to what extent, if at all, admixtures, or deteriorations of foods and drugs, may go, without injuriously affecting the

health of the consumer. That which is required of the
State Board of Health has no semblance to legislation. It
merely relates to a procedure in the law's execution for a
reliable and uniform ascertainment of the subjects upon
which the law is intended to operate. Nor does the duty
imposed upon the state board in any sense postpone the tak-
ing effect of the law until the duty is performed. Perform-
ance can never be said to be complete. The duty is continu-
ing, and will arise at any time when a new food or drug is
put forward. Besides it is paradoxical to say that the law
is not effective until the state board have acted, when it is
certain that without the law they could not act at all. And
to say their act puts the law in operation is to excuse them
from acting, because no law requires it. This class of legis-
lation emanates from an exercise of the police power of the
State for the protection of the public health. The power of
the legislature, and its right to determine, for itself, when
an emergency for such legislation exists, and the means and
instrumentalities necessary to accomplish the end in view,
is no longer a doubtful question. The peculiar character of
the subject, embodying as it does considerations of sanitary
science, is such as to require for just legal control something
more than legislative wisdom, to designate accurately the
subjects and instances intended to be affected. The classifi-
cation of these subjects, and the prescribing of rules by
which they may be determined by a qualified agent is not
legislation, but merely the exercise of administrative power.
The law itself is complete and effective in all its parts. In
respect to the matters to be determined by the State Board
of Health in its execution, it awaits the performance of these
duties. When performed, the law operates upon the things
done by the board. While unperformed, the law remains
ready to be applied whenever the preliminary conditions
exist.

It is said in *Blue* v. *Beach*, 155 Ind., 121, on p. 130:
"In order to secure and promote the public health, the State

creates boards of health as an instrumentality or agency for. that purpose, and invests them with the power to adopt ordinances, by-laws, rules, and regulations necessary to secure the objects of their organization.    While it is true that the character or nature of such boards is administrative only, still the powers conferred upon them by the legislature, in view of the great public interests confided to them, have always received from the courts a liberal construction, and the right of the legislature to confer upon them the power to make reasonable rules, by-laws, and regulations, is generally recognized by the authorities." See, also, *Overshiner* v. *State*, 156 Ind., 187; 51 L. R. A. 748, 83 Am. St. —; *State, ex rel.*, v. *Board of Pharmacy*, 155 Ind. 414; *Groesch* v. *State*, 42 Ind. 547, 556; *Lafayette, etc., R. Co.* v. *Geiger*, 34 Ind., 185, 220.

. 3.   Is the title of the act multifarious, and in conflict with the constitutional requirement that "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title ?" The title of the act is as follows: "An act forbidding the manufacture, sale or offering for sale of any adulterated foods or drugs, defining foods and drugs.   Stating wherein adulteration of foods and drugs consists and defining the duties of the State Board of Health in relation to foods and drugs, their inspection, purity, adulteration, declaring penalties for the violation of the laws, rules and ordinances concerning foods and drugs, also liquors used or intended for drink, repealing acts in conflict therewith."

It must be conceded that this title is unskilfully drawn, and contains much unnecessary verbiage.   This however does not necessarily make it bad.   It is contended that there are three distinct subjects expressed: (1) Adulteration of foods; (2) adulteration of drugs, and (3) adulteration of liquors used or intended for drink.   It has been many times declared by this court that in deciding questions as to the

constitutionality of a statute, the law will be upheld unless its repugnance to the Constitution is so manifest as to remove all reasonable doubt. *Gustavel* v. *State,* 153 Ind. 613, and cases cited.

In the case before us it is readily seen that the subject of the act, and the only subject, is the protection of the people from imposition as a result of harmful adulteration of certain things consumed by them. The entire scope of the law might have been sufficiently expressed as "an act concerning adulterations," or "as an act for the protection of the people against adulterations." It is not essential to a good title that the subject of the act shall be expressed in exact terms; it is sufficient if the subject is fairly deducible from the language employed. And while it serves no useful purpose to embrace in the caption anything but the general subject of the act, a statement of the subsidiary means and methods to be pursued in attaining the end or purpose of the law does not make the title bad. The proper test in all questions of this sort is—does the body of the particular legislation embrace more than one general subject, and such matters as are calculated to assist in reaching the single object intended, and is that subject disclosed by the title? If thus tested it appears that an act embraces but one subject and matters properly connected therewith, and that that subject is shown by the title, it must be held to be constitutional; otherwise not. Forbidding the manufacture and sale of any adulterated foods, drugs, or drinks, defining prohibited foods, drugs, and drinks, and the duties of the State Board of Health in relation to the inspection and prescribing of standards of purity of foods, drugs, and drinks, and declaring penalties for the violations of the law, are all matters clearly tending to a common end, and which unmistakably disclose what that end is. The title of the pure food law of Minnesota reads: "An act in relation to the manufacture and sale of baking powders, sugars and syrups, vinegars, lards, spirituous and

malt liquors, to prevent fraud, and to preserve the public health." Minn. Gen. Law, 1889, p. 48. The supreme court in trying the act by their constitutional provision similar to ours say: "The act does not embrace more than one subject, within the meaning of the constitutional prohibition. The act may be fairly designated as one relating to the adulteration of various articles of food and drink, and its provisions are properly related to that general subject." *Stolz* v. *Thompson,* 44 Minn. 271. See, *Gustavel* v. *State,* 153 Ind. 613; *Central Union Tel. Co.* v. *Fehring,* 146 Ind. 189; *State* v. *Gerhardt,* 145 Ind. 439, 458, 33 L. R. A. 313; *Henderson* v. *State ex rel.,* 137 Ind., 552, 558, 24 L. R. A. 469.

. II. It is next contended that the facts stated in the affidavit are insufficient, for many reasons, to constitute an offense against the laws of the State.

(a) The first and prohibitory section of the act provides "that no person shall, within this State, manufacture for sale, offer for sale, or sell, any drug or article of food which is adulterated within the meaning of this act." It will be noted that the things prohibited by this section do not include the "having in possession with intent to sell." In the second and penalty section it is provided that "Whoever * * * knowingly * * * has in his possession with intent to sell, any substance injurious to health, shall be fined," etc. It is claimed that because the act with which appellant is charged,—"having in his possession with intent to sell"—not being one of the things enumerated in the prohibitory section of the law, the mere affixing of a penalty to the act in a subsequent section does not make it unlawful and punishable. The claim cannot be allowed. It will not do to say, in such cases, that the legislature intends to inflict a penalty for the doing of a lawful act, and hence it is held that the imposition of a penalty for the doing of an act is equivalent to a positive prohibition of the act. *Skelton* v. *Bliss,* 7 Ind. 77; *Bartlet* v. *Viner,* Skinner 322; *Mitchell*

v. *Smith,* 1 Binney (Pa.), 110, 113, 2 Am. Dec. 417; *In re City of Buffalo,* 68 N. Y. 167, 173; Black on Int. of Laws, 65; Sutherland on Stat. Con. §§335, 336.

(b) There is no substance in the contention that the affidavit is bad for want of an allegation that formaldehyde is either poisonous or injurious to health. It is averred that the defendant "had in his possession, with intent to sell the same, one pint of milk, then and there adulterated with a certain substance injurious to health, to wit, formaldehyde." This is sufficient.

(c) The same may be said of the objection to the affidavit because it contained no averment that the milk was adulterated by the defendant. If the defendant knowingly had in his possession adulterated milk with intent to sell the same, it was not of the slightest consequence who adulterated it.

(d) The next objection to the affidavit is that it does not disclose that the prosecution was begun by the State Board of Health as required by the law. The act provides (§2) "it shall be the duty of the State Board of Health to enforce the laws of this State governing food and drug adulterations." Similar provisions are found in the medical law (Acts 1897, p. 259), and in the dental law (Acts 1899, p. 482), and are very common in the laws of other states. We cannot believe that the General Assembly, by imposing a special duty upon specified officers to enforce the statute, meant that individuals should be excluded from making complaint. The law is general, and has a general application. The interdictions prescribed by the act are for the public welfare, as much for one as for another, and it cannot be assumed that the legislature by conferring a duty upon certain officers to enforce the law intended that its enforcement should depend wholly upon the pleasure or discretion of such officers. We see no reason for distinguishing this from other public offenses, in its general object and purpose, or why any one entitled to the law's protection

may not institute its enforcement, as he may, ordinarily, do in other cases.   The evident intent was to confer upon the State Board of Health official duty, in addition to common individual right, to put the law in motion in proper cases. *Commonwealth* v. *Gay*, 153 Mass. 211, 217 ; *Commonwealth* v. *McDonnell*, 157 Mass. 407.

(e) The affidavit is further assailed because it does not charge that the State Board of Health had fixed a standard of purity, nor that the milk in defendant's possession violated the standard, as provided by the act.   Appellant is not charged with violating a standard.   And the character of the act for which he is prosecuted is not determined by a standard.   He is called upon to answer for having in his possession with intent to sell milk adulterated with a substance injurious to health.   The having in possession with intent to sell adulterated food that may in any material degree injuriously affect the health of the consumer is positively forbidden by that provision of the law under which appellant is prosecuted.   Whether or not the State Board of Health had fixed standards of purity in the matters required of them cannot avail one as a defense to a charge in which no standard is required.

(f & g)   It was not necessary for the affidavit to show that the State Board of Health had prepared rules and ordinances, and defined adulterations, and that the milk in possession of appellant violated some rule, ordinance, or standard.   The offense with which appellant is charged is independent of all action of the board and is not affected by anything they may do, or leave undone.

(h)  This objection is like the preceding, and for the same reason is invalid.

(i)  The last objection to the affidavit is that the proviso of section one is not pleaded.   This was not necessary. *Ferner* v. *State*, 151 Ind. 247.   The affidavit was sufficient.

III.  Five reasons for a new trial are argued.   (1)  John F. Geis, a witness for the State, testified that he was by pro-

fession a chemist, had been practicing his profession for be-
tween ten and fifteen years, and was and had been also a
practicing physician for eight years; he had examined the
milk in question for, and had found therein, formaldehyde;
he knew the effect of formaldehyde on the caseine of milk;
this knowledge was acquired, not from experiments, but
wholly from reading, study, and conversations with other
physicians.   The question was then propounded:  "What
is the effect of formaldehyde on milk as a substance of
food?"   To which appellant objected for the reason that
the witness had only shown knowledge from reading and
conversations with others, and not from experiments, and
therefore was not a competent and qualified witness on the
subject.  The witness was permitted to answer.  Courts have
never undertaken to set up a standard of scientific knowledge
by which the competency of a witness may be determined,
and have not gone to the extent of holding that a scientific
witness can only testify from facts learned by him from per-
sonal demonstration.  The general rule, in such cases, in this
State at least, seems to be that where a witness exhibits such
a degree of knowledge, gained from experiments, observa-
tion, standard books, or other reliable source, as to make it
appear that his opinion is of some value, he is entitled to
testify, leaving to the trial court, in the exercise of a sound
discretion, the right to say when such knowledge is shown,
and to the jury the right to say what the opinion is worth;
and, as in all other cases of discretion, this court will review
the action of the trial court only when that discretion clearly
appears to have been abused. *Jenney Electric Co.* v. *Bran-
ham,* 145 Ind. 314, 320, 33 L. R. A. 395; *Parker* v. *State,*
136 Ind. 284, 288; *City of Terre Haute* v. *Hudnut,* 112
Ind. 542, 550; *City of Ft. Wayne* v. *Coombs,* 107 Ind.
75, 85, 57 Am. Rep. 82; *Carter* v. *State,* 2 Ind. 617; *Shover*
v. *Myrick,* 4 Ind. App. 7, 16.  It is clear that there was no
abuse of discretion in this instance.

   2.   At the conclusion of the State's evidence, appellant

moved the court to instruct the jury to return a verdict for him on the ground that no knowledge had been shown in the defendant of the presence of formaldehyde in the milk. The refusal of the court to give this instruction is complained of. The statute is: "Whoever knowingly * * * has in his possession", etc. It must be conceded that under a plea of not guilty it was incumbent upon the State to satisfy the jury beyond a reasonable doubt that the defendant knew there was formaldehyde in the milk. But it was not essential that this proof should be positive and direct. It was sufficient if the State had proved a state of facts from which knowledge might be reasonably and naturally inferred. And it was the duty of the court to overrule appellant's motion if there were such facts in evidence as were calculated to support inferences of guilty knowledge. The record discloses no direct evidence of knowledge, but it is shown that about 10 o'clock a. m., in the month of July, appellant was found with his milk wagon in the streets of Indianapolis, and upon demand gave up to the dairy inspector a pint of milk, appellant saying, as a protest of the demand, that it was the last quart of milk he had, and if it was taken he would be required to purchase other milk to serve his last customer. The milk so surrendered was found to contain formaldehyde. From this it appears that in the middle of the forenoon, in the hot season, appellant had the adulterated milk in his exclusive possession with intent to sell and deliver it to a customer. It is a thing in the common knowledge of the people, and hence known to the court, that milk is a substance that will not in warm weather remain in a merchantable condition, as sweet milk, more than a few hours, and that it very soon becomes unfit for food, *Ross v. Boswell*, 60 Ind., 235, and it might therefore have been inferred that the particular milk in question had been drawn and in the possession of appellant but a short time. Under such circumstances in the absence of any explanation of how

the recently drawn and consequently recently adulterated milk came into appellant's possession, the jury had the right to determine the strength of the inference that would naturally arise therefrom. Being found in exclusive possession of milk recently adulterated made it incumbent upon appellant to show that it was not adulterated by him. His situation seems to us precisely analogous to that of one found in the possession of recently stolen goods, or of counterfeit money. With respect to stolen property it was said by this court in *Johnson* v. *State*, 148 Ind. 522, on p. 524: "When it is proved that property has been stolen, and the same property, recently after the larceny, is found in the exclusive possession of another, the law imposes upon such person the burden of accounting for his possession, and of showing that such possession was innocently acquired; and if he fails to so satisfactorily account for such possession, or gives a false account, the presumption arises that he is the thief." See, also, *Madden* v. *State*, 148 Ind. 183, 187; *Campbell* v. *State*, 150 Ind. 74, 76; *Goodman* v. *State*, 141 Ind. 35. Appellant's motion to instruct the jury was properly overruled.

3. Appellant was permitted to testify that he never used any formaldehyde, and that the milk in question had no formaldehyde in it to his knowledge; that he did the same morning before leaving home put a teaspoonful of a substance known as Palmer's Preserver in nine gallons of milk of which the sample in controversy was a part; that upon inquiry Palmer had previously told him that the preserver had no formaldehyde in it. He was then asked by his attorney to state "what representations were made to you, either in print, writing, or verbally, or in any other way, as to this preservative, prior to the time you used it?" Upon the State's objection that the question asked called for hearsay, appellant was denied the right to answer. In the same connection appellant offered in evidence a printed circular accompanying the Palmer's Preserver when the same was

purchased by the defendant. Among other things it was stated in the circular: "Perfectly harmless, odorless, tasteless, and cheap. Guaranteed to contain no acid, or injurious ingredient. * * * Remember this is positively not an adulterant." This circular was also refused. While the possession of milk recently adulterated with a substance injurious to health required appellant to show affirmatively that such adulteration was without his knowledge, yet, he was entitled to the fullest opportunity to do so. If in fact he had no knowledge, and had a sufficient excuse for want of knowledge, he was entitled to show it. The law will not permit the State to construct about a defendant a circumstantial case, and then deny him an opportunity to explain the circumstances consistently with his innocence. If appellant used the preserver, honestly believing, after making reasonable inquiry and investigation, that it contained no formaldehyde or other substance injurious to health, then he was not guilty of "knowingly," etc. What he did to ascertain the fact about it, who he inquired of, what was said to him by others in whom he might reasonably confide, what was exhibited to him, in writing or printing, and the trustworthiness thereof, were all proper subjects to lay before the jury in explanation of his assertion that he did not, at the time, know the milk contained a substance injurious to health; and if the facts he was thus able to show should be sufficient to overcome the presumption of guilty knowledge raised by the possession, it would have been the duty of the jury to acquit.

It should be borne in mind that this prosecution was under the pure food act of 1899. If it had been under the act of 1901 (Acts 1901, p. 429, §§2165a, 2165b Burns 1901), a very different question as to knowledge would arise.

We are unable to say that the exclusion of the proffered evidence worked no harm to the defendant, and for this reason the cause must be reversed.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.